I see counsel are armed and ready for the first case. We will hear argument in McGhee v. Southwest Electronic Energy. We'll hear from the appellant. Thank you, Your Honors. Good morning. Good morning. Reggie Whitten for the appellant. I was going to reserve, if it's okay, three minutes for my rebuttal. Well, you'll just have to watch the clock. Thank you. Your time is your own. Most of my time I thought I would spend talking about the law, but if it's okay, I thought I'd spend just a moment talking about the facts. On May 12, 2002, a company called Teladrift leased a tool, a drilling tool. It's called a MWD, Measurement While Drilling Tool. And they leased it to Forest Oil and Lantern Drilling, the two defendants in the case. Because in the oil patch they're now doing a lot of directional drilling, sideways and things like that, they need to know where the tool is. So you have to have a power source to be able to run this thing. This tool has a lithium battery, and it's about a yard long. It's very thin. It's about like that in thickness. And it is encased, it's entombed in a copper beryllium tube. That's an alloy. The reason they put it in that tube is there are tremendous forces down hole. In fact, this tool, below it is the drill bit, and it is vibrating. There are high temperatures. And above it are thousands of feet of tool string. So there's tremendous forces on this device. And it is designed by the company that my two clients work for. It is designed to take all of that abuse. And this tool, the lithium battery, as I said, lithium is safe until you have water touch it. Once water touches it, it becomes a bomb. It will blow up. So they used this tool. Nobody reported any problems. The defendants were the operator. And in the oil patch, they own that well. They have to guard against anything falling down that hole. There are a million things that can go wrong if they drop something down the hole. But in particular, you can damage the equipment. We know that's what happened here. It's not even debatable. We've actually submitted to the trial court. There is a picture of some bolts that ended up down hole. They're not supposed to be there, ever. There's a very common drill screen that goes up top. With the drill screen there, it's virtually impossible for anything to fall in. But it's a cardinal rule. If it falls in, the operator, it's his fault. What's the source of this rule? In the operator's manual that warns that if a bolt falls in, this could happen? No, Your Honor, that's a good question. Our expert witness is in the oil patch, and it's more custom than anything. But I don't think that was disputed in the court below, even by the other side. It's the operator's running everything. He's the only one, or they are the only ones that can control it dropping down there. We got a copy of all the equipment used on the Will site by the operator, and they don't even list the drill screen there. They charge for it. It wasn't there. That's the only way this thing could have gotten down there. But what's fascinating... Counsel, just a counsel-related question. Yes, sir. Is there any evidence that Forrester Lantern knew that a bolt had fallen into the drill hole? No. I can't say that anybody ever testified that they knew it fell down. But I think our expert would have said, and actually we attached a report in the court below, but it's prima facie, they just can't let it go down there. Whether they knew or they didn't know, that's the problem. So they're negligent, somehow, for letting the bolt or any debris going down the drill hole? Yes, Your Honor. And it's not even debatable... So from that, we have to get to some type of duty to the plaintiffs who are injured? That is correct. That's where we need your help. That is correct. And I'll go to that. I may just have one moment longer, and I'll get to the law. There's pictures of the bolt and the copper beryllium tube, and they fit like a hand in a glove. There's no question the bolts were there. I don't think the defendant even disputes that it's not supposed to be there. I think they actually agree with that. What about foreseeability? Is there any evidence that the drilling company, the drillers, knew that this was a possible consequence? I think so, Your Honor. I depose... What do you mean, think? Where in the record is this evidence, and what does it say? I think it's in our experts' report, and I think it's in the depositions we attached. I took depositions of a corporate representative. This company took bankruptcy, and all the employees disappeared who were actually on the well site. Well, you know, every year we all get new law clerks, and I always tell my clerks, they come in and say, I believe this, and I think that. And I say, you know, beliefs are for church, and facts are for courts. And I just kind of would like to know what you're telling us, what you're going to tell us about the facts. So I'd like you to tell me in the record where there is some fact that these drillers knew that if the nut fell, if something fell in the casing of the well, that a foreseeable consequence was the explosion of the well of the battery at some point downstream when the battery was being replaced in the device. That's an excellent question, and I can do that. As I said, Your Honor... And you said what, and you... I can do that. I can answer... You can do that. Where is the record, then? You can do it. Tell us where. In the corporate representative deposition of the defendant that I took, I asked him about this very thing, and he testified. They had a duty to prevent things from falling down the hole. He testified a million things can go wrong. It can cause the equipment to break. It can cause equipment to get damaged. And indeed, it can cause the well... Batteries to explode when the device is being repaired. Yes. I think everybody, including the defendant, knew if you get lithium wet, it's going to blow up. It's well known in the industry. They knew all that. Well, where in Mr. Poole's testimony did he talk about the lithium battery? I think I asked him about it. I can't tell you the page, but I think it's in the record, Your Honor. You think it is? I do. That's my recollection. And in fact, I asked him about do you have a duty to keep things from falling down in the hole, and they said yes. Yeah. That is in there. That's undisputed. In fact, I was going to read that, and will read that. And I think your question was good also because it brings up the foreseeability question. That's really the heart of the thing. I think this came down to two cases primarily. The Del Brell case from the Oklahoma Supreme Court, which is a case we rely on, but the trial court talked about also. And with all due respect to the court, I think the court took one word of that case, which I would contend respectfully was addictive. What the court said in Del Brell was that we hold as a matter of law that one who is paid to repair a car owes a duty of care to both the owner of the car and to the general public. And the court, as you all know, focused on that word paid, and indeed that party was paid in that case. But and to the general public, it doesn't, I respectfully contend it doesn't make sense to talk, to focus just on paid and then put in the words and to the general public. I think it's pretty clear the general public didn't pay for anything. So I think that case actually supports our point. And I think with all due respect, the trial court incorrectly relied too much on that word payment. We respectfully submit that payment is not what governs whether there's a duty. It's whether it's foreseeable harm to the general public. And our expert witness contends that dropping the bolt down there caused it. And anybody in this business knows you're talking cause. And cause is different than duty. Duty requires foreseeability. It is. Individuals within the zone of foreseeability. How are these plaintiffs within the zone of foreseeability? Don't you have so many layers of ifs and whens and maybes that could have connected these two incidents? I think you're right, Your Honor. The zone is important. But here's the deal. If you drop bolts down that hole, you can damage, and we know it did damage. This isn't really rocket science. It's a hard, the piece of bolt is harder than the equipment it's hitting up against. And it did indeed cause a leak. Fine. Let's say we agree, or at least for purposes, or at least for these purposes, we agree with you that it can cause it. Now what? Is that, are you home free at that point? No, Your Honor. I think you have to go further and go further, right? You've got to show us that they knew or could foresee that it would damage the equipment. Correct? Indeed. And then they have to go, you have to go further. You have to say that you have to say that they either knew or could foresee that when the instrument went in for repair, that guys would use a crowbar to open it. Correct? It's not really a crowbar, but they beat on it a lot with, yeah. They did. Yeah, they beat on it with rubber. I thought it was a crowbar, but... It's a push bar. A push bar. All right. Well, let's... And you've raised two things. De minimis non curat lex. So we now are pushing it with a crowbar, and now you have to, you still aren't home free, right? You've got to say that they knew or could foresee that doing so could damage a copper tube that contained a battery. Yes. And then they had to know or foresee that the bomb would explode in the workshop. Indeed. I agree with everything Your Honor said. That's a lot of ifs and buts. I think we get there. If you look at the McClure v. Sunshine furniture case, which we quoted in our briefs, it's an Oklahoma civil appellate court 2012. The furniture fell off the truck. Yes, Your Honor. That's correct. And in that case, they actually gave credit to the same thing that happened in our case. In that case, the court considered the testimony of Sunshine's corporate representative, which we did exactly the same thing. We took a corporate rep. Sunshine's president acknowledged that such activity may present a risk of injury, so that his employees exercised judgment as to how to accomplish the loading task or whether to refuse the task. The conclusions that may be drawn from these statements are, one, injuries can occur when furniture is improperly loaded. Well, that's not this case, right? No, it's not. In this case, the furniture would have to have a pipe with a lithium battery, and you'd have to go foresee that the furniture guys would beat up on the pipe, and then you'd have to foresee that the bomb would explode back at the repair shop, not here at the site where the furniture is being moved, but some other place at some distant and remote time and place. If I may, Your Honor, I think you're raising two issues, which are important. Both of them are, and they're separate. If I may address them both. First, I took the corporate rep depot. He admitted that they have a duty to make sure things can't fall down the hole. Why? Because bad things can happen, a whole lot of bad things. That's equivalent, and back to your Oklahoma case, of having a duty to make sure the furniture doesn't fall out of the truck because bad things can happen. Yes, and now I'd like to address the second counsel. On that first point, could I just ask you one thing? Yes, Your Honor. In your expert's report, there's reference to deposition testimony of Mr. Gopalan. I'm sorry, I'm drawing a blank on that name, Your Honor. Well, it's right there in the report, but in any event, it says that he indicated the debris catcher, and that the hole in the head made them unique, so that even if a debris catcher had been used, the bolts could have gotten into the drill hole. That's the deposition testimony. It's in your expert's report. Yes, Your Honor. I think that may be, but still, they're not supposed to drop down, the debris catcher. Well, maybe they're not supposed to drop down, but things get in there, right? And when these and put them back together is to clean them out and get them ready to go again. Isn't that the way all this is supposed to work? That is true, Your Honor. So even if the tool is returned to Teladrift, and maybe there is debris in it, and maybe that presents a risk of harm, and maybe even it's a foreseeable risk of harm, but is it an unreasonably dangerous foreseeable risk of harm? Don't you have to show that under the cases? I think we do, and I think that becomes at some point a question of fact, but may I say this, Your Honor? This may be portrayed as a crowbar, and it may be portrayed as someone doing something wrong and beating on it, but that is a hotly contested issue. That would be like arguing that when you take a champagne bottle and you crisp the nuclear sub and break it on the front of that sub that you've done something wrong. This tool is designed to take forces thousands of times more difficult than banging on the tool. If banging on this tool can damage the tool, then it can never be used down whole. So this is being misportrayed. I do want to make sure that's out there, but that's not the issue here. That would be a fact question maybe for a jury as to whether there was some kind of contributory negligence, but the question here, really, the operator, that's his will. He or she, whoever the operator is, has to maintain that nothing falls down in that hole. My red light's going on. May I finish? Just finish your sentence. Briefly. That is their duty, and whether it's small enough to go through the catcher or not, they're not supposed to have those bolts up there. They're not supposed to fall down the hole, and they admitted that if something does and it damages things, it becomes a bomb. It could have gone out when they pulled it out of the hole and blown everybody up there. It just happened to blow up back at the office, and that's what happened. My time is up.  Thank you, Your Honor. Thank you, Your Honors. My name is Clark Craftster. Could you pull the mic up? Sure. My name is Clark Craftster, and I represent the defendants, the employees in this case, Force and Lantern. Before getting into too much, there are a few things I heard counsel reference in terms of what are pretty much facts and things that were said in the record that I wanted to just clarify briefly. First of all, there was some significant discussion about the corporate rep's testimony, and that was by Mr. B.J. Poole, who has testified. While he did indicate that, in general, there I wanted to point out that the deposition questions about that were extremely vague, and it seemed to us that it were intentionally that way. Well, he said what he said, and he said we don't want things to go down the hole. We try to guard against that. We don't want things to go down the hole, right? I mean, this isn't a big problem, I think. Correct. That's a basic fact in the case. We can accept that. Yes, and we certainly wouldn't try to portray it differently. It is a fact that the people at the dwelling drill site tried to do their best to keep things from falling down the hole. However, as was indicated in that testimony, safety does come first. In fact, as Mr. Poole said, if a tool or something is going to fall down the hole, we can get it out later, even if we have to stop the production process. But don't put yourself at risk. Safety comes first. Then the general desire to keep things out of the hole comes next. What do you say in response to the appellant's challenge of the district court's ruling relying on the case that it relied on? Oh, about the payment? The payment issue. Well, and that was pretty much my next point. The district court did not rely solely on payment. And in fact, I have trouble finding where plaintiff's counsel is drawing that conclusion from. The district judge's opinion was thorough. And it applied the general correct Oklahoma standard of the issue being Which is, could you just articulate the standard? What is it under Oklahoma law that creates a duty? It must be reasonably foreseeable that the defendant's conduct is going to create the risk of the harm to the plaintiff. It has to be connected to the plaintiff. It can't just be a general question of is your conduct creating a risk to someone or something? Well, what do you do with the Sunshine Furniture case? That was a situation where the furniture company stacked a bunch of chairs on a truck. The chairs fall off and harm a person driving behind the truck. Who would know that that would be that person harmed? Where's the foreseeability there? Well, that case is in fact extremely different from our scenario. And in fact, in the Sunshine Furniture case, the defendant is a business holding itself out offering services. It's offering to, as part of its service, fasten heavy furniture to a moving vehicle and to where it's quite obvious that if they fail to use reasonable care to fasten the furniture to the vehicle, that the obvious result of that is on the road it could fall off and injure other drivers. So they didn't know. Of course, I'm not saying that the defendant has to foresee in the future the specific individual or everything specific about how the event occurred. But it does have to be quite obvious that as a result of what they're doing in the natural course of life, there's a risk to a certain class of people. But in our case, it is not at all clear that that is what they are being faulted for. Well, could I just break it down this way? Would you agree that the failure to prevent the bolts from falling into the Pro Shop tool created a risk of harm? I'm just going to stop there. Did it create a risk of harm? I want to make sure I'm being as candid as possible with the Court. I just said if they failed to prevent bolts from falling into the tool, did that alone create a risk of harm? How could it not have created a risk of harm? I would agree. That's the easy question. Did it create a foreseeable risk of harm? Most certainly not. Why not? It depends on what the harm we're talking about is. If it's possible that it could go down and damage some equipment or something like that, then damage to equipment is one thing. I would think that's probably about as far as the foreseeability of the operator could go. What's different about our case is that this was far removed and it was the result of a whole string of other things that not only did Forrest and Leonard not know about, but the law didn't impose a duty on them to know about. In fact, they're entitled to rely on the manufacturer to provide a product that is suitable for the conditions and the situation it is held out for service in. Could I just ask your position on Oklahoma law relating to duty based on foreseeability? And that is, does the foreseeability of the risk of harm have to involve a harm that is unreasonably dangerous? In other words, there's harm and then there's harm. Does it have to be an unreasonably dangerous risk of harm? I think that's correct, yes. And do you think it's correct because you have a case? Well, I believe it may have been the case that the court cited because I've noticed that there is actually a little bit of overlap and a little lack of clarity in the law in terms of the requirement that the conduct be unreasonably dangerous and the legal duty, the initial legal question of is there a legal duty. But yes, the overall concept is the conduct has to be creating a risk of harm that is unreasonably dangerous. And it has to be reasonably foreseeable that it's unreasonably dangerous. And because of the relationship between the parties, the far superior knowledge of the manufacturers who put this thing together and offered it out for the services for being used in these extreme harsh conditions with all kinds of things going on around the well site, it's just not, everybody knows the fact that things can get into the mud and it's not foreseeable that a bolt that somehow got in there unbeknownst to the operators. What does the discovery record show that it was common for these tools after they were used and then returned to Telegryph that it was common that there could be and was debris remaining in the tools? Does the record show that? Absolutely. It's in several portions. This was noted in our statement of the facts in the response brief. But particularly with respect to McGeehee's testimony, who is the lead leader of the team who was working on the tool in question here during the disassembly process, this was not an uncommon scenario. Telegryph, which was the plaintiff's employer, was well aware of this, that the tools become lodged because of, to use McGeehee's words, small, hard, abrasive debris like a rock or something else. Those were his words. In fact, on the day in question, the tool in question, in the early process of them trying to dislodge this tool, and again, this was extremely common, they found some bolts come out with the mud. They knew that there had been some bolts in there and it was discussed with McGeehee being the team leader for Telegryph there that it was probably a rock or something like that that was hung up because of the way this tool was designed,  Well, I wanted to ask you about that because you seem to consider that to be a significant fact that after Mr. McGeehee had discovered that there were bolts, that he continued with attempts to disassemble. And my question is, how does that go to the issue of duty? I mean, it almost seemed like it was on the surface a contributory negligence argument, but how does it go to the duty of the defendants? How is it relevant to that? That's a good question. I can understand it and I've thought about that myself. But with the legal question that we're facing here, we didn't bring that up to raise some sort of contributory negligence argument. It goes to the heart of the issue of was it reasonably foreseeable to Forrest and Lantern that this would occur? And Forrest and Lantern is relying on Telegryph as the manufacturer and how could a customer renting a tool to use know as much or more as the manufacturer? Well, did the defendants here, your clients, did they know about how the tool was cleaned and repaired and put back in service after it was returned? No, no. They did not know and there's no evidence in the record that they had any understanding of the disassembly process that Telegryph created for their product on their site after it had been used so it could be reused by others. Well, but they knew that, didn't they? They knew that these tools were used and reused? I would think they would have to know that, I think, just as a matter of common sense. But how they did that, they certainly did not know and they certainly had no reason to know that a bolt had even gotten in there or that that could cause... So what case would you rely on back to that question? The district court relied on a case called Bugler, B-U-G-L-E-R. Do you agree with the court's analysis? Yes, I do. In the initial summary judgment briefing, I had frankly not seen Bugler and I think that's why it wasn't in our summary judgment briefing. But when obviously the court... Well, is that case really on point? Because in that case, the defendant's actions did not make the work setting that caused the injury more dangerous. Here, arguably, your clients did, in that the bolts went down the hole, causing the damage, causing the explosion, all of that. Isn't there a distinction? I think you're correct in pointing that out. But with our case, we facilitated this to occur in purely a but-for causation sense, which is not enough. In other words, perhaps the bolt that perhaps came from our drilling site caused this tool to be hung up. There were many other factors that caused the actual explosion that we could not know about. And that is the real question. And I think with that railroad case that you were discussing, what made the district court's assessment of that case correct, I think, is the recognition that the plaintiff in that case was an employee of another company and the defendant company was a separate company, did not have any control over the training. Which would parallel here. Yes, that's the parallel. And I think that's primarily what the district court... And that the individuals harmed there and the plaintiff here, in both cases, those individuals were doing their usual work. Correct. I think that's why the court relied on that. But again, that was not the sole case in support of that correct decision. You're out of time. Oh, I'm sorry. Any other questions? Thank you, counsel. And you're out of time also. Your time was up. I am indeed. May I have 10 seconds just to correct something that Judge Madison asked me? Okay. If I may, just 10 seconds. Judge Madison, you asked me, I think, about the debris catcher. And I just want to make the point, you were correct what you read, but that's not what's missing here. There's a debris catcher and there's a drill screen. They're different. The debris catchers catch trash and big things, like, say, a water bottle. The drill catcher is a fine screen and it would catch bolts. And they're two different things and it's talked about in page 3, the last paragraph of my expert Rick Johnson's report where he talks about it's inexcusable not to have. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted.